PROSKAUER ROSE LLP
Myron D. Rumeld
Deidre A. Grossman
1585 Broadway
New York, NY 10036
(212) 969-3021
(212) 969-3006

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x
JAMES WATSON, JOSEPH AVITABILE,    :
THOMAS McGLADE, and ROBERT    :
SHEEHAN, Individually and On Behalf    :
of All Others Similarly Situated,    :
   :
        Plaintiffs,    :
   :   08 Civ. 4436 (JSR)
    -against-    :
   :
CONSOLIDATED EDISON OF NEW YORK    :
and THE CONSOLIDATED EDISON    :
PENSION AND BENEFITS PLAN,    :
   :
        Defendants.    :
---------------------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. ii

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................... 4

    Con Edison's Retirement Plan ................................................................ 4

    Plan Payment Options and the Level Income Option ........................... 5

    Actuarial Equivalence of All Benefit Options ...................................... 8

    The Plaintiffs ......................................................................................... 9

    Plaintiffs' Factual Allegations ............................................................ 10

    Plaintiffs' Legal Claims for Relief ..................................................... 11

ARGUMENT ................................................................................................ 13

I.     PLAINTIFFS LACK ARTICLE III STANDING UNDER ERISA
          BECAUSE THEY HAVE SUFFERED NEITHER
          INJURY-IN-FACT, NOR ANY INJURY REDRESSABLE
          UNDER ERISA, BY ELECTING THE LEVEL INCOME OPTION ........................... 13

          A.     Plaintiffs Have Failed to Allege Injury-in-Fact ....................... 14

          B.     Plaintiffs Cannot Satisfy the Requirement of Redressability ................... 17

II.    PLAINTIFFS' FIFTH, SIXTH, AND SEVENTH CLAIMS FOR
          RELIEF SHOULD BE DISMISSED BECAUSE THEY ARE
          PREEMPTED BY ERISA ................................................................. 20

III.   THE CLAIMS OF PLAINTIFFS WATSON, SHEEHAN,
          AND MCGLADE HAVE BEEN RELEASED ........................................... 22

IV.   THE CLAIMS OF PLAINTIFFS WATSON, SHEEHAN,
          AND MCGLADE ARE, IN ANY EVENT, TIME-BARRED ........................ 24

CONCLUSION .............................................................................................. 25

## TABLE OF AUTHORITIES

CASES                                                                        PAGE(S)

Aetna Health, Inc. v. Davila,
    542 U.S. 200, 209 (2004) ....................................................................................21

Alfarone v. Bernie Wolff Constr. Corp.,
    788 F.2d 76, 79 (2d Cir.), cert. denied, 479 U.S. 915 (1986).................................12

Callery v. United States Life Ins. Co.,
    392 F.3d 401, 405-06 (10th Cir. 2004),
    cert. denied, 546 U.S. 812 (2005) .......................................................................19

Cent. States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco
    Managed Care,
    433 F.3d 181, 198, 200-01 (2d Cir 2005) ............................................ 13, 14, 15

Coan v. Kaufman,
    457 F.3d 250, 263-64 (2d Cir. 2006)....................................................................18

Conn. v. Physicians Health Svc's of Conn., Inc.,
    287 F.3d 110, 116-17 (2d Cir.), cert. denied, 537 U.S. 878 (2002).....................14

Doe v. Blue Cross Blue Shield of Md., Inc.,
    173 F. Supp. 2d 398, 400, 403-04 (D. Md. 2001) ...............................................16

Egelhoff v. Egelhoff,
    532 U.S. 141, 146 (2001) .............................................................................20, 22

Faulkner v. Beer,
    463 F.3d 130, 134-35 (2d Cir. 2006).................................................................. 4

Gerosa v. Savasta & Co., Inc.,
    329 F.3d 317, 322-23 (2d Cir.), cert. denied, 540 U.S. 967 (2003).....................18

Great-West Life & Annuity Ins. Co. v. Knudson,
    534 U.S. 204 (2002)............................................................................................18

Harley v. 3M,
    284 F.3d 901, 907-08 (8th Cir. 2002)..................................................................16

Horvath v. Keystone Health Plan East, Inc.,
    333 F.3d 450, 457 (3d Cir. 2003)....................................................... 14, 15, 16

Impress Commc'ns v. Unumprovident Corp.,
    335 F. Supp. 2d 1053, 1058-59 (C.D. Cal. 2003)................................................16

*In re AIG Advisor Group*,
　　No. 06 Civ. 1625 (JG), 2007 WL 1213395, at *4 (E.D.N.Y. Apr. 25, 2007) ........................16

*In re Unisys Corp. Retiree Med. Benefit Litig.*,
　　242 F.3d 497, 505 (3d Cir. 2001) ......................................................................................24

*Int'l Audiotext Network v. Am. Tel. & Tel*,
　　62 F.3d 69, 72 (2d Cir. 1995) ............................................................................................ 4

*Kennedy v. Empire Blue Cross & Blue Shield*,
　　989 F.2d 588 (2d Cir. 1993) ..............................................................................................11

*Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan*,
　　935 F.2d 1360, 1367-68 (2d Cir. 1991) .............................................................................23

*LaRue v. DeWolff, Boberg & Assocs.*,
　　128 S. Ct. 1020, 1022 n.1 (2008) ................................................................................4, 18

*Linder v. BYK-Chemie USA, Inc.*,
　　No. 02 Civ. 1956 (JGM), 2006 WL 648206, at *6-10 (D. Conn. Mar. 10, 2006) .................22

*Luckett v. Bure*,
　　290 F.3d 493, 496-97 (2d Cir. 2002) .............................................................................4, 14

*Lujan v. Defenders of Wildlife*,
　　504 U.S. 555, 560-61 (1992) .............................................................................................13

*Maio v. Aetna, Inc.*,
　　221 F.3d 472, 488 (3d Cir. 2000) ......................................................................................15

*Mass. Mut. Life Ins. Co. v. Russell*,
　　473 U.S. 134, 142 (1985) ..................................................................................................18

*McLaughlin v. Rowley*,
　　698 F. Supp. 1333, 1339 (N.D. Tex. 1988) ......................................................................22

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
　　514 U.S. 645, 655 (1995) ..................................................................................................20

*Pancotti v. Boehringer Ingelheim Pharms., Inc.*,
　　No. 06 Civ. 1674 (PCD), 2007 WL 2071624, at *7 (D. Conn. July 17, 2007) ....................21

*Pilot Life Ins. Co. v. Dedeaux*,
　　481 U.S. 41, 46 (1987) .................................................................................................20, 21

*Ranke v. Sanofi-Synthelabo Inc.*,
　　436 F.3d 197, 201-03 (3d Cir. 2006) .................................................................................24

*Smith v. Dunham-Bush, Inc.*,
    959 F.2d 6, 8-9 (2d Cir. 1992) ......................................................................21

*Walker v. Asea Brown Boveri*,
    214 F.R.D. 58, 66 n.7 (D. Conn. 2003) ........................................................22

*Weinreb v. Hospital for Joint Diseases Orthpaedic Institute*,
    285 F. Supp. 2d 382 (S.D.N.Y. 2003),
    *aff'd*, 404 F.3d 167 (2d Cir. 2005) ..............................................................19

*Yablon v. Stroock & Stroock & Lavan Ret. Plan & Trust*,
    No. 01 Civ. 0452 (CBM), 2002 WL 1300256, at *4-6 (S.D.N.Y. June 11, 2002)...........22, 23

## OTHER AUTHORITIES

29 U.S.C. § 1104 ....................................................................................................21

29 U.S.C. § 1108(b)(1) ..........................................................................................21

29 U.S.C. § 1113 ....................................................................................................24

29 U.S.C. § 1132(a)(2) ..........................................................................................24

29 U.S.C. § 1132(a)(3) ..........................................................................................24

29 U.S.C. § 1144(a) ...............................................................................................20

26 C.F.R. § 1.411(d)-3(g)(16) (2006) .................................................................... 7

Fed. R. Civ. P. 12(b)(1) .......................................................................................... 4

Fed. R. Civ. P. 12(b)(6) ............................................................................4, 10, 23

## PRELIMINARY STATEMENT

Plaintiffs are four former employees of the Consolidated Edison Company of New York, Inc. ("Con Edison") who elected to receive their pension payments from the Consolidated Edison Pension and Benefits Plan (the "Plan")[1] under a payment option called the "Level Income Option." Plaintiffs' complaint alleges that the Level Income Option "cheats" them out of pension benefits. Their claim is based on a grossly simplistic conception that ignores the required role that actuarial assumptions play in funding pension plans and calculating pension benefits, and the fact that the Plan documents here require that all forms of payment options, including the Level Income Option, be actuarially equivalent to one another.

The Plan pays a pension based on the retiree's years of service and salary. The pension payment options available to Plaintiffs include the "Normal Form of Benefit" and the Level Income Option, among others. The Normal Form of Benefit is explained in detail later, but essentially it provides a retiree a monthly payment for life that is unaffected when the retiree begins to receive Social Security payments. Thus, employees who retire before Social Security age and who take the Normal Form of Benefit experience a substantial increase in total retirement income (pension plus Social Security) when they start receiving payments from Social Security.

Based on Collective Bargaining Agreements negotiated by Plaintiffs' unions in the 1990's, the Level Income Option was added to the Plan, and the Plan as so amended was

---

[1] The Consolidated Edison Pension and Benefits Plan was originally adopted to provide retirement benefits to Con Edison's collectively bargained employees and their spouses. (*See* Affidavit of Hector J. Reyes ("Reyes Aff."), Ex. A at 1 (Introduction)). Effective January 1, 2001, that plan was renamed the Consolidated Edison Retirement Plan and two other plans – the Consolidated Edison Retirement Plan for Management Employees and the Employees' Retirement Plan of Orange and Rockland Utilities, Inc. – were merged into that plan as a single plan. (*Id.*) The merged plan continues to maintain the separate benefit formulas for each of the prior plans. (Reyes Aff., Ex. B at 2).

subsequently approved by the Internal Revenue Service.  Under the Level Income Option, employees retiring before they become eligible for Social Security can elect to receive larger monthly pension payments before the projected date for their receipt of Social Security benefits, and smaller pension payments thereafter.  Employees who begin pension payments as early as age 55 and delay receipt of Social Security until age 65 will receive a full ten years of larger monthly pension payments.  As the name of the option implies, these retirees have a level monthly total income.  For example, a worker whose Normal Form of Benefit would have been $2,514 a month, and whose Social Security benefit at age 66 is projected to be $1,340 per month, might elect the Level Income Option and receive $3,058 ($544 dollars more per month) until he or she starts to receive Social Security benefits, at which time his or her pension benefit is lowered to $1,718 per month thereafter.  The total monthly income stays level, since the reduced pension payments from the Plan are augmented by the Social Security payments.

The Plan and the Collective Bargaining Agreements require that a retiree's Level Income Option pension benefit be the actuarial equivalent of the benefit that he or she would have received under the Normal Form of Benefit.  "Actuarially equivalent" means that, at the time the retiree elected the Level Income Option, the present dollar value of the projected income stream under the Normal Form of Benefit and the Level Income Option pension are equal.  To determine the actuarially equivalent benefit, the Plan's actuary applies two assumptions: a mortality assumption and an interest assumption, both of which are prescribed by the Collective Bargaining Agreements.

Obviously, retirees who elect the Level Income Option and die before their Social Security age receive more in cash from the Plan than they would have under the Normal Form of Benefit (their monthly checks were higher and they never reached the age where the pension

payments decreased). Similarly, retirees who live to 100 (far past their assumed ages of death from the mortality tables) probably receive less in cash from the Plan than they would have under the Normal Form of Benefit because they will have a lowered pension payment for more years than the actuaries calculated based on the mortality tables. But this is the nature of pension plans. Actuarial equivalence among the retirement options made available to participants can be determined only at the time of retirement and cannot thereafter be recalibrated based on individual experiences.

Because the benefit received under the Level Income Option is equivalent in actuarial value to the other benefit options available to them, Plaintiffs have suffered no injury by electing the Level Income Option. They certainly have suffered no injury for which ERISA affords monetary relief. Therefore, Plaintiffs lack Article III standing to assert federal claims under ERISA. In the absence of such constitutional standing, the Complaint must be dismissed for lack of subject-matter jurisdiction.

Even if the Complaint is not dismissed in its entirety for lack of subject-matter jurisdiction, the Court should dismiss Plaintiffs' state law claims on the grounds of ERISA preemption, because such claims challenge the administration of the Plan and the benefits available under that Plan, and, in most instances, duplicate Plaintiffs' ERISA claims. As such, they are directly within the sphere that ERISA is intended to regulate exclusively.

Furthermore, the claims of three of the four Plaintiffs should be dismissed for the independent reason that they each executed releases of their claims against Con Edison and the Plan in return for a substantial lump-sum payment and other special early retirement enhancements. Alternatively, the Court should dismiss the claims of these three Plaintiffs on

statute of limitations grounds, as they each made their benefit elections well over six years before the commencement of this lawsuit.

## STATEMENT OF FACTS

Except where otherwise indicated, the following statement of facts is based on the allegations contained in Plaintiffs' Class Action Complaint ("Compl.") and documents referenced therein, which this Court may consider on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See, e.g.*, *Faulkner v. Beer*, 463 F.3d 130, 134-35 (2d Cir. 2006); *Int'l Audiotext Network v. Am. Tel. & Tel*, 62 F.3d 69, 72 (2d Cir. 1995).[2]

**Con Edison's Retirement Plan**

Pursuant to Collective Bargaining Agreements entered into between Con Edison and Utility Workers' Union of America, AFL-CIO Local Nos. 1 and 2 and the International Brotherhood of Electrical Workers Local No. 3 (the "Local Unions"), employees of Con Edison who are on Con Edison's weekly payroll and work within the jurisdiction of these Local Unions automatically participate in the Plan. (Reyes Aff., Ex. A at 14 (Art. I § 1.26); Ex. C at 76; Ex. D at 44). As weekly employees, Plaintiffs were participants in the Plan.

The Plan is a "defined benefit plan," meaning a plan that provides participants "a fixed level of retirement income . . . based on the employee's years of service and compensation." *LaRue v. DeWolff, Boberg & Assocs.*, 128 S. Ct. 1020, 1022 n.1 (2008). These benefits are funded exclusively by Con Edison, meaning that Plan participants do not contribute to the cost of these benefits. (Reyes Aff., Ex. B at 3).

---

[2] The Court may also consider additional evidence for the purpose of adjudicating the Article III standing issue discussed below, since it is a matter that determines this Court's subject-matter jurisdiction and thus may be considered under Federal Rule of Civil Procedure 12(b)(1). *See, e.g.*, *Luckett v. Bure*, 290 F.3d 493, 496-97 (2d Cir. 2002).

The Plan ordinarily calculates a participant's pension by multiplying the participant's "Final Average Pay" by a percentage, or, if a higher amount would result, under an "Alternative Formula" that applies to certain classes of participants. (Reyes Aff., Ex. A at Appendix F, F.1; Ex. B. at 16-18).[3] Ordinarily, the Plan will reduce the pension benefits of participants who retire and begin taking pension distributions *before* Normal Retirement Age, at age 65 (the benefits start earlier and are spread over a longer period of time). (Reyes Aff., Ex. A at 51 (Art. IV § 4.04(b)(3)); Ex. B at 37-38). The percentage reduction will depend on the age at which participants begin taking pension payments. However, employees who are at least age 55 with 30 or more years of service can retire and begin taking distribution of an unreduced early retirement pension. (Reyes Aff., Ex. A at 50 (Art. IV § 4.04(b)(1)); Ex. B at 37).

**Plan Payment Options and the Level Income Option**

Under the Plan, Con Edison has an obligation to pay participants income based upon the pension formula discussed *supra*. That income can be paid in various ways. Consistent with ERISA, the Plan allows participants to choose among several options of pension payment. For single participants, the Normal Form of Benefit (or "Automatic Form of Payment") is a "Single Life Annuity," with all payments ending upon the participant's death. (Reyes Aff., Ex. A at 79 (Art. V § 5.01(b)(1)); Ex. B at 59). For married employees, the Normal Form of Benefit is the "Qualified Joint & 50% Survivor Spouse Annuity," pursuant to which the participant receives an annuity for the duration of his or her life, and then the surviving spouse receives an annuity

---

[3] Final Average Pay is, generally speaking, the participant's highest average pay over a specified number of consecutive years within the preceding 10-year period. (Reyes Aff., Ex. A at 18 (Art. I § 1.43)). The percentage is based on years of service (*e.g.*, 1.50% per year for the first 24 years of service, 2.0% per year for service from 25 to 30 years, and 0.5% per year for each year of service after that). (Reyes Aff., Ex. B at 18). Under the Alternative Formula, a participant receives (if it is higher) a pension calculated as 2.2% of the participant's "Total Salary" up to 30 years, and 1.5% per year for each year of "Accredited Service" over 30 years. (Reyes Aff., Ex. B. at 18).

worth 50% of the original pension for the duration of his or her life. (Reyes Aff., Ex. A at 79 (Art. V § 5.01(b)(2)); Ex. B at 65). There are other optional forms of payment, such as the "Twelve Year Certain and Life Annuity Option," whereby participants can receive somewhat reduced monthly benefits during their lives in return for the guarantee that, if they should die in fewer than twelve years, their designated beneficiaries will continue to receive the same benefit for the duration of the twelve-year period. (Reyes Aff., Ex. A at 83 (Art. V § 5.02(b)(1)); Ex. B at 59).

As a result of collective bargaining negotiations between Con Edison and the Local Unions, the Plan was amended effective December 1, 1996 for Local Nos. 1 and 2 members and September 1, 1997 for Local No. 3 members to give Plan participants an additional optional form of benefit known as the Level Income Option. (Reyes Aff., Ex. C at 78; Ex. D at 46; Ex. E at 6). Pursuant to the Level Income Option, participants retiring and beginning their pensions before they become eligible for Social Security can elect to receive larger pension payments before the projected date for their receipt of Social Security benefits, and smaller pension payments thereafter. (*Id.*) The adjustments are calculated such that the total amount of the monthly payments received from the Plan and Social Security throughout retirement remains level from the first month participants receive a check until the day they die. (*See* Reyes Aff., Ex. A at 85-89 (Art. V § 5.02(b)(4)).[4]

Under the Level Income Option, the participant chooses to receive more earlier and less later. For example, an unmarried Plan participant, such as plaintiff Thomas McGlade, who makes no election and takes the Normal Form of Benefit – a Single Life Annuity – would

---

[4] The leveling is not exact because the actual Social Security benefit may differ somewhat from the projected amount, in part because the projection will not take into account cost of living adjustments. (Reyes Aff., Ex. A at 87 (Art. V § 5.02(b)(4)(a)(iii))).

ordinarily receive a monthly pension at age 56 of $2,514 (for the remainder of his or her life).

(*See* Reyes Aff., Ex. I).  Instead, however, he or she can elect to receive the Level Income

Option.  Under that option he or she can receive – from age 56 up to age 66 – $3,058 per month

($544 dollars more per month).  At age 66 and thereafter, the pension would pay $1,718 per

month.  The difference between the monthly pension amount received before age 66 (when the

participant begins to receive Social Security) and the amount received at age 66 and thereafter is

$1,340, which is equal to the amount of the monthly Social Security check that the participant is

projected to receive beginning at age 66.  Hence, the Level Income Option creates a guaranteed

total retirement income that stays level from the date of retirement until death.

Level income options are popular among plan participants because, among other reasons,

the option provides an opportunity for early retirement to workers who otherwise would not have

sufficient resources to retire before they receive Social Security benefits.[5]  This optional form of

payment is specifically contemplated by regulations issued by the Internal Revenue Service

("IRS"), *see* 26 C.F.R. § 1.411(d)-3(g)(16) (2006) (defining "social security leveling feature" as

"a feature with respect to an optional form of benefit commencing prior to a participant's

expected commencement of social security benefits that provides for a temporary period of

higher payments which is designed to result in an approximately level amount of income when

the participant's estimated old age benefits from Social Security are taken into account").

Indeed, the Plan received a favorable determination letter from the IRS in 2003, which

---

[5]  Published sources confirm that a level income option is offered by a number of industry-wide pension funds, *see, e.g.*, www.aftrahr.com/410.asp, as well as by collectively bargained pension plans of other IBEW locals, *see, e.g.*, www.ibew701fbo.com/level_income_option.htm.

effectively endorsed the Plan's use of, and methodology for applying, the Level Income Option. (Reyes Aff., Ex. F).[6]

**Actuarial Equivalence of All Benefit Options**

Most significantly for the issues raised by Plaintiffs, the union Collective Bargaining Agreements and the Plan require that the amount of the pension payments made under each of the pension options offered by the Plan be actuarially equivalent to the Normal Form of Benefit. (*See*, *e.g.*, Reyes Aff., Ex. B at 59, 65). The Normal Form of Benefit – such as the Single Life Annuity – is converted into an optional form of benefit, such as the Level Income Option, by converting the present value of one stream of income into another stream of income. Hence, at the time the participant elects the pension option, the present value of the projected stream of pension payments under each option is equal. To determine the actuarially equivalent benefit, the Plan's actuaries use two assumptions: (i) a mortality assumption, which takes into account the life expectancy of the participant, and hence the expected period of time in which the participant will receive the stream of pension payments; and (ii) an interest assumption, which takes into account the time value of money.

For the Level Income Option, the requirement of actuarial equivalence, as well as the specific mortality and interest assumptions to be used to arrive at actuarially equivalent benefits, is specified in the Collective Bargaining Agreements with the Local Unions, pursuant to which:

> Under the level income option employees will receive the actuarial equivalent of their pension-receiving a higher pension amount from the date of their retirement through, at the employee's election, age 62 or age 65 and a reduced pension thereafter. The actuarial equivalent is based on an interest rate of 7.5% and the 1983 GAM unisex (50% male, 50% female) mortality table.

---

[6] The IRS's Publication 794 explains the significance of favorable determination letters. *See*, *e.g.*, www.irs.gov/pub/irs-utl/pub794.pdf.

(Reyes Aff., Ex. C at 78; *see also* Ex. D at 46). The Plan similarly provides: "The present value of the benefit payable under this option shall be equal to the present value of the Pension Allowance otherwise payable to the Participant, determined on the actuarial bases specified in Appendix A."[7]  (Reyes Aff., Ex. A at 86 (Art. V § 502(b)(4)(a)(ii))).

As a result of the principles of actuarial equivalence in the Plan, Con Edison's pension benefit obligation to participants is the same without regard to the *form* of payment (*i.e*, the option) that the participants elect. Whether the participant chooses to take the pension benefit in a steady stream of income or the Level Income Option is a personal choice. The Plan has an obligation to calculate participants' monthly pension allowances so that over time, based on designated interest rates and mortality table factors, each payment option pays the same pension benefits.

**The Plaintiffs**

Plaintiffs are four former weekly employees of Con Edison, each of whom was a participant in the Plan by virtue of being a member of one of the Local Unions. Each Plaintiff elected to receive a pension in the form of the Level Income Option. (Reyes Aff., Exs. G-J).

Plaintiff Avitabile retired and commenced receiving a pension effective 2006. (Reyes Aff., Ex. J). Plaintiffs Watson, Sheehan and McGlade retired and commenced receiving their pension effective January 1, 2000. (Reyes Aff., Exs. G-I). These last three retired pursuant to a special early retirement program called Voluntary Retirement Incentive - Support Organization (VRISO). (Reyes Aff., Ex. K). Persons such as these three Plaintiffs retiring under VRISO were eligible to receive various benefit enhancements, including, but not limited to: (i) a one-time

---

[7] The referenced Appendix (Subappendix A.1 - Table G) consists of a listing of ratios to be used in order to determine, for each retirement age, the adjustment to be made to the projected Social Security benefit in order to arrive at the amount to add to the normal pension. The ratios are calculated based on the actuarial assumptions for mortality and interest.

special lump-sum early retirement incentive payment of up to 100% of their Final Average Salary; (ii) unreduced early retirement pensions for participants meeting certain age and service requirements; (iii) credited service and salary through December 31, 1999; and (iv) health and life insurance coverage at active employee levels through the end of 1999. (Reyes Aff., Ex. K).[8] In return for these enhancements, the three signed releases whereby they waived and released Con Edison and the Plan "from any claim, known or unknown, that [the employee] may have as of the effective date of this Release based upon or arising out of the termination of [the employee's] employment with the Company." (Reyes Aff., Exs. L-N). Like other participants in the program, Watson, Sheehan and McGlade were allowed 45 days to consider the terms of the VRISO program and the Release and were advised to consult legal counsel as well as a tax consultant or financial planner before signing the release. (*Id.*)

**Plaintiffs' Factual Allegations**

In the Complaint, Plaintiffs allege that they were misled into believing that the Level Income Option functioned like a loan, which loan payments "would cease when . . . Social Security would kick in and the monthly pension checks would be reduced until the loans [were] paid back." (Compl. ¶¶ 25, 26). In that regard, Plaintiffs contend that Defendants "failed to disclose, and the materials provided to Plaintiffs did not state, that any interest would be required to be paid on these loans . . . and further failed to disclose that the monthly pension benefits of early retirees who accepted the Level Income Option would be reduced for life[.]" (Compl. ¶ 27). According to Plaintiffs, "[t]he amount each Plaintiff is required to pay back each month has no rational or legal relation to the amount borrowed or to other Plaintiffs or Class members who

---

[8] This information may be considered by the Court on a motion to dismiss under Federal Rule 12(b)(6) because, in their Complaint, Plaintiffs allege that Con Edison made misrepresentations during its early retirement presentations held in July 1999. (Compl. ¶¶ 23-27). The information cited is in the documents provided to the Plaintiffs at that time.

chose the Level Option." (Compl ¶ 30).  Plaintiffs also allege that Defendants "arbitrarily

instituted interest rates" on participants who chose the Level Income Option.  (Compl. ¶ 30).

Plaintiffs further allege that, had they properly been informed, and not "fraudulently

induced" to elect the Level Income Option, "none of the Plaintiffs or Class members would have

elected the Leveling Income Option."  (Compl. ¶ 33).  Furthermore, they contend that, as a result

of their allegedly misinformed decision to elect the Level Income Option, "Plaintiffs, and other

Class members, will be required to pay, depending upon the length of their lives, tens, if not

hundreds, of thousands of dollars above the amount actually borrowed.  This amount of interest,

for loans ranging on average between forty thousand and seventy five thousand dollars, is far in

excess of what is appropriate and violates civil and criminal usury laws."  (Compl. ¶ 34).

Plaintiffs cannot identify where in the Plan it states that participant loans are permitted.  Nor do

they dispute that their pension payments under the Level Income Option were determined based

on actuarial assumptions for interest and mortality prescribed by the Collective Bargaining

Agreements.

**Plaintiffs' Legal Claims for Relief**

Plaintiffs assert a total of seven Claims for Relief: four claims for breach of fiduciary

duty under ERISA,[9] and three claims under state law.  Plaintiffs asserted these claims without

first exhausting the Plan's claims review procedures mandated by ERISA.[10]

---

[9]  Although the Third and Fourth Claims are not captioned as breaches of fiduciary duty,
Defendants' conduct is characterized as such.  (*See* Compl. ¶¶ 43, 46).

[10]  Defendants have not moved to dismiss the claims for failure to exhaust administrative
remedies because they understand the Complaint to assert claims for statutory violations, *i.e.*,
breaches of fiduciary duty under ERISA.  Should Plaintiffs challenge the manner in which their
pension benefits were calculated, however, including whether the Level Income Option was
actuarially equivalent to their other pension options, they should be required to first exhaust that
claim at the Plan administrative level. *See Kennedy v. Empire Blue Cross & Blue Shield*, 989

The First and Second Claims for Relief allege that Defendants breached their fiduciary duties under ERISA § 404 "[b]y fraudulently inducing and encouraging Plaintiffs and the Class members to opt for the Level Income Option, despite knowing that this would result in Plaintiffs receiving drastically reduced benefits for the majority of their retirement, by failing to disclose that unlimited interest would be assessed on the loan."  (Compl. ¶¶ 37, 38, 41, 42).

The Third Claim for Relief alleges that the Plan's Summary Plan Description "failed to disclose the disadvantages of the Level Option."  It also alleges that Plaintiffs never received the Summary Plan Description.  (Compl. ¶ 45).

The Fourth Claim for Relief alleges that Defendants breached their statutory or regulatory obligations to "offer sufficient information 'to explain the relative value of the optional forms of benefits available under the plan[.]'"  (Compl. ¶ 49).

Plaintiffs' Fifth and Sixth Claims for Relief restate the claims in the First and Second Claims for Relief, but assert them under state law, rather than ERISA § 404.  (Compl. ¶¶ 52-55). Their Seventh Claim for Relief also mimics the allegations of misrepresentation contained in Plaintiffs' ERISA claims, but alleges further that, under the Level Income Option, "Plaintiffs and Class members have been paying back amounts which are in clear violation of New York's civil (and even criminal) usury laws."  (Compl. ¶¶ 63, 64).

In their Prayers for Relief, Plaintiffs request certification of a class of similarly situated participants; a declaration that Defendants violated the law; and the following forms of monetary relief: "compensatory damages" and "punitive damages" for Defendants' allegedly wrongful conduct; and "extraordinary equitable, and/or injunctive relief," including "restitution, disgorgement" and a restriction on Defendants' use of the "ill-gotten funds" that they allegedly

---

F.2d 588 (2d Cir. 1993); *Alfarone v. Bernie Wolff Constr. Corp.*, 788 F.2d 76, 79 (2d Cir.), *cert. denied*, 479 U.S. 915 (1986).

received by virtue of the Level Income Option. The four ERISA counts, however, merely allege

that Plaintiffs suffered "damages" as a result of the wrongs alleged. (Compl. ¶¶ 39, 43, 46, 50).

## ARGUMENT

### POINT I
### PLAINTIFFS LACK ARTICLE III STANDING
### UNDER ERISA BECAUSE THEY HAVE SUFFERED NEITHER
### INJURY-IN-FACT, NOR ANY INJURY REDRESSABLE UNDER
### ERISA, BY ELECTING THE LEVEL INCOME OPTION

The pensions that Plaintiffs elected to receive under the Level Income Option are

equivalent in actuarial value to the pensions they would have received without the leveling. This

means that the present value of the pensions they are receiving – calculated with the use of

actuarial assumptions that were negotiated and agreed to by the Local Unions and included in the

Collective Bargaining Agreements and the Plan – is equal to the present value of any of the other

benefit options they could have elected instead. This being the case, Plaintiffs cannot claim to

have suffered any tangible injury. Nor can Plaintiffs identify any relief which is redressable

under the applicable provisions of ERISA's civil enforcement scheme. For these reasons, their

ERISA claims should be dismissed for lack of Article III standing.

The requisite elements of Article III standing are: (1) injury-in-fact, *i.e.*, some concrete,

particularized actual or imminent injury; (2) causation, *i.e.*, the injury must be traceable directly

to the challenged action of the defendant, and not the result of a third party's independent action;

and (3) redressability, *i.e.*, the plaintiff's injury must be likely to be redressed by a favorable

decision. *See Cent. States Southeast & Southwest Areas Health & Welfare Fund v. Merck-

Medco Managed Care*, 433 F.3d 181, 198 (2d Cir. 2005) (*citing Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560-61 (1992)). "Without a plaintiff's satisfaction and demonstration of the

requirements of Article III standing, a federal court has no subject matter jurisdiction to hear the

merits of a plaintiff's . . . claim." *Id.*  The party invoking the federal court's subject-matter

jurisdiction bears the burden of proving that it exists.  *Luckett*, 290 F.3d at 496-97.  Dismissal is

required here, since Plaintiffs are unable to satisfy their burden.

**A.      Plaintiffs Have Failed to Allege Injury-in-Fact**

The Second Circuit has stated that the pivotal requirement for Article III standing is

"injury-in-fact."  *Cent. States*, 433 F.3d at 198, 200-01; *see also Conn. v. Physicians Health

Svc's of Conn., Inc.*, 287 F.3d 110, 116-17 (2d Cir.) (describing the injury-in-fact element of

Article III standing as an "irreducible constitutional minimum"), *cert. denied*, 537 U.S. 878

(2002).  In order to satisfy this requirement, a plaintiff who purports to bring a representative

action under ERISA for restitution or disgorgement of an amount of money must demonstrate a

personal loss that is concrete and not speculative.  *Cent. States*, 433 F.3d at 199; *Horvath v.

Keystone Health Plan East, Inc.*, 333 F.3d 450, 457 (3d Cir. 2003).[11]  For purposes of Article III

standing, a concrete loss is a direct economic loss, including a loss in the value of a participant's

benefits.  *See Cent. States*, 433 F.3d at 199; *Horvath*, 333 F.3d at 457 (discussed below).

In *Central States*, the Second Circuit applied these principles in overturning, among other

orders, an order granting class certification in an action alleging ERISA breach of fiduciary duty

claims, finding that there were serious questions about whether the named plaintiffs had suffered

an economic loss qualifying as an injury-in-fact under Article III.  The named plaintiffs included

---

[11]  The Second Circuit will not require a showing of actual harm for a claim seeking to enjoin a
plan or its fiduciaries to comply with their disclosure obligations.  *Cent. States*, 433 F.3d at 199.
That limited qualification is irrelevant here because, whether framed as monetary or injunctive,
the various forms of relief demanded by Plaintiffs are in the nature of increased pension
payments by means of the elimination of the pension reductions once their "loan" is paid back.
(*see, e.g.*, Prayers for Relief ¶ g).  Although Plaintiffs have contended that they were misled, and
that Defendants breached disclosure requirements, there is no request for an injunction to comply
with disclosure requirements.  Even if there were, this would not alter the conclusion that
Plaintiffs lack standing to seek the various other forms of relief demanded.

individual beneficiaries of health plans who claimed that a pharmaceutical benefits manager breached its duties under ERISA by, among other things: (1) favoring the products of its parent company; (2) developing programs to allow pharmacists to switch beneficiaries' prescriptions to the parent company's products in a way that increased cost to the plans; and (3) "making affirmative misrepresentations" in this regard. Because participants generally paid flat co-pays for prescriptions regardless of the cost of the drug, the Court observed that they could not be financially impacted by defendant's alleged drug-switching programs or any "wrongful disclosures or misstatements" in connection therewith. *Id.* at 202. Hence, the Court stated, they would have suffered no loss qualifying as an injury-in-fact. *Id.*

In so ruling, the Second Circuit cited favorably from a similar opinion by the Third Circuit in *Horvath*, 333 F.3d at 457. In that case, a health plan participant alleged that an HMO breached its fiduciary duties by failing to disclose fully to plan participants the cost-control incentives offered to its participating physicians. Although the participant never had a claim for benefits declined, she contended that the undisclosed incentives had a "potential impact [on] healthcare decisions made by its physicians and thus decrease[d] the overall level of care provided." *Id.* at 453. On this basis, she demanded restitution and/or disgorgement of overpaid coverage premiums, measured as the difference between the value of the plan as she perceived it (*i.e.*, without the physician incentives) and the value of the plan as actually configured (*i.e.*, with the physician incentives). *Id.*

The Third Circuit held that the participant had not sufficiently alleged injury-in-fact. In so ruling, the Court cited its reasoning in *Maio v. Aetna, Inc.*, 221 F.3d 472, 488 (3d Cir. 2000), where it found that a plaintiff lacked standing to sue under RICO in the absence of an allegation that the healthcare the participants received "actually was compromised or diminished" as a

15

result of the defendant's conduct.  "Diminished value," the *Horvath* court concluded, without an actual diminution in benefits, was harm that was far too speculative to satisfy Article III's requirement of individual loss.  *Id.* at 457.  *See also Impress Commc'ns v. Unumprovident Corp.*, 335 F. Supp. 2d 1053, 1058-59 (C.D. Cal. 2003) (relying on *Horvath* to dismiss ERISA breach of fiduciary duty action for lack of Article III standing where plaintiffs had not alleged that they had been provided with fewer benefits than they were otherwise entitled to); *Doe v. Blue Cross Blue Shield of Md., Inc.*, 173 F. Supp. 2d 398, 400, 403-04 (D. Md. 2001) (dismissing for lack of Article III standing participant claim that utilization review practices diminished value of policies where, although plaintiffs contributed to costs of coverage, they had never been denied benefits).  *See also Harley v. 3M*, 284 F.3d 901, 907-08 (8th Cir. 2002) (holding that participants of defined benefit plan lacked Article III standing to bring suit on behalf of plan for its investment losses caused by fiduciary imprudence where participants' benefits were not reduced); *In re AIG Advisor Group*, No. 06 Civ. 1625 (JG), 2007 WL 1213395, at *4 (E.D.N.Y. Apr. 25, 2007) (granting defendants' motion to dismiss and holding that plaintiffs did not satisfy Article III standing requirements because they had not purchased funds challenged under relevant securities laws).

Like the plaintiffs in *Central States* and *Horvath*, Plaintiffs here cannot establish that they have suffered an actual diminution in benefits.  Because the Plan mandates that the Level Income Option Plaintiffs selected have the same actuarial value as the other benefit options available to them, Plaintiffs received a benefit that was equal in value to the benefit they might otherwise have elected.

Furthermore, even if, for purposes of this motion, the Court were to give credence to Plaintiffs' theory that the Level Income Option acted as a "loan," and hence that Plaintiffs could

be harmed if their repayments exceeded the amount of that loan, the harm alleged would still be too speculative to satisfy the Article III standing requirements. Plaintiffs admittedly retired only a few years ago, in their fifties and, by their own admission, the risk of repaying substantially more than they received would materialize only when they reach their seventies (and even then, only if the Court were to completely disregard the time value of the money received and repaid).

Plaintiffs concede this point in their Complaint, where they purport to use the example of a hypothetical Class Member living to age 75 to establish a loss. (Compl. ¶¶ 31, 32). Plaintiffs have not identified this hypothetical Class Member, nor have they suggested that *they* have reached age 75. Indeed, because all the Plaintiffs are indisputably younger than their expected age of death in the mortality tables, the Plan has, thus far, paid Plaintiffs more than they would have received had they chosen the Normal Form of Benefit without Level Income Option.

There is an equal likelihood that all of the Plaintiffs will come out ahead, in that they could die before the so-called "loan" is fully repaid. The same would be true with respect to the numerous class members they purport to represent: some may outlive the mortality assumption, and thus could conceivably end up behind, with the benefit of hindsight, while numerous others would wind up ahead if they passed away sooner. At this juncture, to project harm to any of the four Plaintiffs, even under Plaintiffs' theory of the case, would be entirely speculative.

In short, Plaintiffs cannot satisfy the requirement of injury-in-fact.

**B.**     **Plaintiffs Cannot Satisfy the Requirement of Redressability**

Plaintiffs are also unable to demonstrate that the injury they are claiming – being misinformed about the Level Income Option – is redressable under ERISA. The monetary relief that they purport to seek for these claims is unavailable as a matter of law.

17

Plaintiffs' entitlement to monetary relief is limited by the statutory language governing their cause of action under ERISA. Although the Complaint does not specify under which of ERISA's civil enforcement provisions they purport to be proceeding, the only available cause of action for breach of fiduciary duty claims seeking individualized relief is ERISA § 502(a)(3), which affords a participant a cause of action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."[12] As the language of the statute and recent Supreme Court jurisprudence confirms, the relief available under § 502(a)(3) is injunctive and equitable in nature only. *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002). Thus, Plaintiffs are not entitled to seek recovery of compensatory and punitive damages. *See also Coan v. Kaufman*, 457 F.3d 250, 263-64 (2d Cir. 2006) (holding that relief available under ERISA must be equitable, not monetary relief); *Gerosa v. Savasta & Co., Inc.*, 329 F.3d 317, 322-23 (2d Cir.) (same), *cert. denied*, 540 U.S. 967 (2003).

As noted above, Plaintiffs' four ERISA Claims for Relief (Claims First through Fourth) each allege that Plaintiffs suffered "damages," and contain no request for equitable relief. (Compl. ¶¶ 39, 43, 46, 50). Even if one were to give Plaintiffs the benefit of the doubt, and assume that the ERISA claims also seek the relief specified in the Prayers for Relief, Plaintiffs still would have no viable claim for relief. The only relief denominated "equitable" in the

---

[12] The other statutory cause of action for a participant claiming a breach of fiduciary duty, ERISA § 502(a)(2), does not apply where, as here, a participant seeks individual relief, as opposed to recovery of plan losses. *See Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985). The Supreme Court's recent decision in *LaRue v. DeWolff, Boberg & Assocs.*, 128 S. Ct. 1020 (2008), does not alter this conclusion. The Court's finding that participants of individual account plans may sue to recover losses experienced in their account balances was explicitly limited to defined contribution plans, and left intact the law limiting claims by defined benefit plan participants to those seeking losses to the plan itself.

Prayers for Relief is an order "attaching, impounding or imposing a constructive trust or otherwise restricting the proceeds of Defendants ill-gotten funds" and "restitution, disgorgement and/or remedial relief." (Prayers for Relief ¶ h). No such relief is available here unless Defendants have ill-gotten gains. Defendants have no gains (ill-gotten or otherwise) because, as previously stated, the benefits that Plaintiffs elected to receive have the same actuarial value – and hence the same actuarial cost to the Plan – as the other benefit options that were available. There is no basis here for the imposition of a constructive trust or an order of restitution of ill-gotten gains.

Although other relief is demanded that purports to be injunctive in nature (*see, e.g.*, (Prayers for Relief ¶¶ d, g), that relief is aimed at increasing Plaintiffs' pension benefits – beyond what they are entitled to under the actual terms of the Plan – through the curtailment of the period in which their pension payments would be reduced by the estimated Social Security amount. This Court addressed a similar issue in *Weinreb v. Hospital for Joint Diseases Orthopaedic Institute*, 285 F. Supp. 2d 382 (S.D.N.Y. 2003), *aff'd*, 404 F.3d 167 (2d Cir. 2005), in considering plaintiff's request for an injunction directing the defendant to enroll a participant *nunc pro tunc* in a plan for benefits for which he would have been eligible but for defendant's failure to provide accurate plan information. This Court concluded that the request for injunctive relief was "a thinly disguised attempt" to recover extra-contractual, monetary relief, which the Supreme Court in *Great West* and subsequent cases have concluded is not available under ERISA § 502(a)(3). *Id.* at 388 (collecting cases). That same conclusion applies here. *See also Callery v. United States Life Ins. Co.*, 392 F.3d 401, 405-06 (10th Cir. 2004) (finding that plaintiff's demand for an injunction to proceeds of life insurance policy that plaintiff mistakenly

believed would cover her spouse was in fact a demand for monetary relief that was unavailable under ERISA), *cert. denied*, 546 U.S. 812 (2005).

In short, absent a showing of injury-in-fact, or a demand for relief that is available under ERISA, Plaintiffs have no standing to pursue their ERISA claims.

## POINT II
### PLAINTIFFS' FIFTH, SIXTH, AND SEVENTH CLAIMS FOR RELIEF <u>SHOULD BE DISMISSED BECAUSE THEY ARE PREEMPTED BY ERISA</u>

ERISA § 514(a) provides in relevant part that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan[.]" 29 U.S.C. § 1144(a). The United States Supreme Court has consistently interpreted this provision expansively in order to ensure that employee benefit plans be administered on a nationally uniform basis. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 (1987) ("the express pre-emption provisions of ERISA are deliberately expansive, and designed to establish pension plan regulation as exclusively a federal concern") (quotation omitted); *Egelhoff v. Egelhoff*, 532 U.S. 141, 146 (2001) ("We have observed repeatedly that this broadly worded provision ['related to'] is 'clearly expansive.'") (*quoting N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)). Given its expansive reach, the preemption provision clearly precludes all of Plaintiffs' state law claims.

Plaintiffs' Fifth Claim for Relief – labeled "Fraudulent Inducement" – alleges that Defendants knowingly issued false and misleading oral and written representations to induce Plaintiffs and Class Members to choose the Level Income Option under the Plan. (Compl. ¶ 52). Plaintiffs' Sixth Claim for Relief – labeled "Breach of Fiduciary Duty" – alleges that Defendants had a duty to provide complete and truthful information to Plaintiffs when detailing and explaining the Level Income Option and that they breached their fiduciary duties by actively

concealing this information. Both claims not only relate to an ERISA plan and Plaintiffs' benefits thereunder, but duplicate the ERISA claims alleged in the First and Second Claims for Relief. As such, they fall squarely within ERISA's broad preemptive sweep. *See*, *e.g.*, *Pilot Life*, 481 U.S. at 46 (holding that employee's common law causes of action of breach of contract, and fraud in the inducement were preempted by ERISA); *Smith v. Dunham-Bush, Inc.*, 959 F.2d 6, 8-9 (2d Cir. 1992) (finding that ERISA preempted employee's common law claims for breach of oral promise to pay pension-related benefits and negligent misrepresentation); *Pancotti v. Boehringer Ingelheim Pharms., Inc.*, No. 06 Civ. 1674 (PCD), 2007 WL 2071624, at *7 (D. Conn. July 17, 2007) (concluding that ERISA preempted plaintiff's claims of fraud and negligent misrepresentations because the claims were regarding benefits under the terms of the plan); *see also Aetna Health, Inc. v. Davila*, 542 U.S. 200, 209 (2004) (holding that "[a]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted").

The Seventh Claim of the Complaint, in addition to reiterating fraudulent inducement claims, alleges that the Level Income Option provides loans to Plan participants at usurious interest rates. For the reasons stated, the Level Income Option is not a participant loan, nor does it operate as a loan, and hence Plaintiffs' claim is really one for misrepresentation, rather than for receiving a usurious loan. As such, the Seventh Claim is preempted for the reasons discussed above. Even if one were to give credence to the allegation that Plaintiffs received a "loan," however, the claim would still be preempted because ERISA expressly regulates plan loans to participants. *See* 29 U.S.C. § 1108(b)(1). The application of state law to these practices would undermine the goal of maintaining a uniform national system of administering employee benefit

plans and, as such, would violate ERISA's preemption principles. *See Egelhoff*, 532 U.S. at 148 (finding preempted state law governing revocation of beneficiary designation forms where ERISA regulates area and reliance on state law would interfere with nationally uniform plan administration); *see also McLaughlin v. Rowley*, 698 F. Supp. 1333, 1339 (N.D. Tex. 1988) (finding preempted Texas usury statute as applied to participant loans on grounds that statute would interfere with requirements of ERISA § 408(b)(1), setting out criteria for participant loans).

In short, Plaintiffs' Fifth, Sixth, and Seventh Claims for Relief should be dismissed on the grounds that they are each preempted by ERISA.

### POINT III
### THE CLAIMS OF PLAINTIFFS WATSON, SHEEHAN AND MCGLADE HAVE BEEN RELEASED

Even if Plaintiffs' claims survived outright dismissal, the claims of three of the four Plaintiffs (Watson, Sheehan and McGlade) should be dismissed because these Plaintiffs signed releases of their claims when they retired early under VRISO, in exchange for enhanced benefits.

It is well-established that claims under ERISA may be released through a general release of claims, as long as the release is knowing and voluntary. *See*, *e.g.*, *Yablon v. Stroock & Stroock & Lavan Ret. Plan & Trust*, No. 01 Civ. 0452 (CBM), 2002 WL 1300256, at *4-6 (S.D.N.Y. June 11, 2002) (enforcing release where plaintiff received additional retirement benefits in exchange for signing release); *Linder v. BYK-Chemie USA, Inc.*, No. 02 Civ. 1956 (JGM), 2006 WL 648206, at *6-10 (D. Conn. Mar. 10, 2006) (concluding that release signed by plaintiff was clear and unambiguous, precluding "plaintiff from bringing suit against the employer defendant for any and all claims 'arising under or in any way connected with his employment.'"); *Walker v. Asea Brown Boveri*, 214 F.R.D. 58, 66 n.7 (D. Conn. 2003)

(collecting cases finding that general releases of "any and all" claims enforceable to preclude claims under ERISA).  In evaluating whether the release of an ERISA claim is knowing and voluntary, courts consider the following factors:

> 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, [as well as whether . . . the employee had a fair opportunity to do so] and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

*Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1367-68 (2d Cir. 1991) (quotations omitted).  "This list of factors 'is obviously not exhaustive,' and the presence or absence of any single factor is not necessarily dispositive." *Yablon*, 2002 WL 1300256, at *5 (quotation and internal citation omitted) (dismissing plaintiff's ERISA claims under Federal Rule 12(b)(6) on grounds that claims were, as a matter of law, knowingly and voluntarily released under *Laniok* factors, even where court assumed that plaintiff lacked education and business experience).[13]

Here, the three Plaintiffs signed a release which by its terms extended to all claims "known or unknown, that [the employee] may have as of the effective date of this Release based upon or arising out of the termination of [the employee's] employment with the Company[.]" All three Plaintiffs were afforded ample time to review and consider the release, and to consult with an attorney.  Moreover, signing the releases enabled Plaintiffs to receive the substantially enhanced benefits offered under VRISO, which otherwise would not have been available to them.  (*See supra* at 9-10).

---

[13]  The same principles would apply to Plaintiffs' state law claims, if they were not found to be preempted.

In short, Plaintiffs Watson, Sheehan and McGlade left Con Edison on their own terms and for generous consideration. The release they each signed in return for that consideration was knowing, voluntary and meaningful, and accordingly bars their claims. Therefore, these Plaintiffs' claims should be dismissed in their entirety.

**POINT IV**

**THE CLAIMS OF PLAINTIFFS WATSON, SHEEHAN
AND MCGLADE ARE, IN ANY EVENT, TIME-BARRED**

Even if this Court were to assume that Plaintiffs Watson, Sheehan and McGlade had standing to pursue their claims and that such claims had not been released, their claims should still be dismissed because their claims (including their state law claims once properly recharacterized under ERISA) purport to be for fiduciary breach and, as such, are time-barred.

ERISA § 413 provides that breach of fiduciary duty claims must be brought within the earlier of (1) three years of actual knowledge of the breach; or (2) six years after the date of the last action that caused the breach or, in the case of an omission, the last date on which the fiduciary could have cured the breach. *See* 29 U.S.C. § 1113. Where, as here, plaintiffs claim to have relied to their detriment on alleged misrepresentations, the six-year limitations period begins to run from the date of the misrepresentation, or, at the latest, on the last date upon which a clarifying communication could have prevented the plaintiff's detrimental reliance. *See, e.g.*, *Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 201-03 (3d Cir. 2006); *In re Unisys Corp. Retiree Med. Benefit Litig.*, 242 F.3d 497, 505 (3d Cir. 2001).

Here, Plaintiffs contend that they relied to their detriment on alleged representations and nondisclosures made in or about July 1999 when they elected to receive pensions payable under the Level Income Option. (Compl. ¶ 28). Because Watson, Sheehan and McGlade began to receive pensions as of January 1, 2000 (Reyes Aff., Exs. G-I), and because they could not

thereafter change their form of pension (Compl. ¶ 29), the six-year limitations period for their claims commenced no later than January 1, 2000. The time for bringing their claims thus expired January 1, 2006, long before May 2008, when this lawsuit was commenced. Therefore, these Plaintiffs' claims should be dismissed in their entirety.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' motion and dismiss the Complaint in its entirety. Alternatively, it should dismiss the claims of Watson, Sheehan, and McGlade.


Dated: New York, New York
      July 22, 2008

                Respectfully submitted,

                PROSKAUER ROSE LLP


            By:  /s/ Myron D. Rumeld
                Myron D. Rumeld
                Deidre A. Grossman
                1585 Broadway
                New York, NY 10036
                mrumeld@proskauer.com
                dagrossman@proskauer.com
                (212) 969-3021
                (212) 969-3006

                *Attorneys for Defendants*